Gregory W. Mitchell
THE MITCHELL LAW FIRM, L.P.
1100 W. Campbell Road, Suite 200
Richardson, Texas 75080
(972)463-8417 – Office
(972)432-7540 – Facsimile
State Bar ID: 00791285
PROPOSED ATTORNEY FOR DEBTOR

EXHIBIT
D

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

In re: **North Texas Fiber, Inc.**   §     **Case No. 26-32522-mvl-11**
           §
     *Debtor*     §     **Chapter 11**

## DEBTOR'S MOTION TO SELL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363(b)

**NO HEARING WILL BE CONDUCTED ON THIS MOTION UNLESS A WRITTEN OBJECTION IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AND SERVED UPON THE PARTY FILING THIS MOTION WITHIN TWENTY-ONE (21) DAYS FROM THE DATE OF SERVICE UNLESS THE COURT SHORTENS OR EXTENDS THE TIME FOR FILING SUCH OBJECTION. IF NO OBJECTION IS TIMELY SERVED AND FILED, THIS PLEADING SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT. IF AN OBJECTION IS FILED AND SERVED IN A TIMELY MANNER, THE COURT WILL THEREAFTER SET A HEARING. IF YOU FAIL TO APPEAR AT THE HEARING, YOUR OBJECTION MAY BE STRICKEN. THE COURT RESERVES THE RIGHT TO SET A HEARING ON ANY MATTER.**

TO THE HONORABLE U.S. BANKRUPTCY COURT JUDGE:

COMES NOW, North Texas Fiber, Inc. ("**Debtor**"), Debtor in the above-styled and numbered bankruptcy proceeding, and files this its *Motion to Sell Property Free and Clear of Liens, Claims and Encumbrances* (the "**Motion**") and in support thereof respectfully represent:

### I. JURISDICTION

1.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

---

**MOTION TO SELL PROPERTY FREE AND CLEAR – PAGE 1**

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

3. The Debtor originally filed this case under Chapter 11 of the Bankruptcy Code on June 5, 2026 ("**Petition Date**").

4. Since the Petition Date, Debtor has operated as a Debtor and Debtor-in-Possession.

5. The Debtor owns certain assets (the "**Assets**") described in the Asset Purchase Agreement ("**APA**") attached hereto as Exhibit A.[1]

6. By this Motion, Debtor seeks this Court's authority to sell the Assets.

7. The Debtor seeks to sell the Assets for an anticipated total sales price of $1,983,040.00.[2]

8. The sale shall be free and clear of all liens, claims and encumbrances, and such liens, claims and encumbrances shall attach to the sales proceeds.

9. Reasonable and necessary closing costs associated with the sale, as well as ad valorem taxes, shall be paid at the time of closing.

10. Debtor's lender – Liberty Banker's Life Insurance Company ("**LBLIC**") – has a lien on all of Debtor's assets, including the Assets the subject of this Motion.

11. The price at which the Assets are to be sold is greater than the aggregate value of all liens on such Assets.

12. Debtor asserts that the Assets to be sold represent less than 5% of Debtor's assets, and therefore proposes to pay no more than 5% of the proceeds received from the sale of the Assets to LBLIC as adequate protection.

13. The Debtor requests that the fourteen (14) day period following the entry of an

---

[1] The APA is supplemented by a letter from the Purchaser confirming its commitment, a copy of which is attached hereto as Exhibit B.
[2] The precise total sales prices is a calculated amount pursuant to the APA (*see* Exhibit A therein).

**MOTION TO SELL PROPERTY FREE AND CLEAR – PAGE 2**

Order allowing the sale be waived.

## III. REQUEST FOR RELIEF

### A. Approval of Sale Pursuant to Section 363(b)

14.     "The [Debtor], after notice and a hearing, may use, sell, or lease other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1)." The [Debtor] must provide some sound business justification for the proposed sale." *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986). The Debtor has adequately marketed the property.   Considering the present market, and condition of the Property, the Debtor asserts the proposed sales price is fair and reasonable.   Delay may result in loss of the buyer, or further reduction in value received. Delay will result in additional ongoing expenses to the Debtor and the estate. In exercise of its business judgment, the Debtor asserts that the proposed sale is in the best interest of the estate. *Id.*; *see also, In re the Bombay Company, Inc.*, 2007 Bankr. LEXIS 3218 (Bankr.N.D. Tex. 2007).

15.     The sale will bring needed capital to the Debtor following LBLIC's refusal to provide previously promised funds.   The funds will be used by the Debtor to complete projects that were in progress when LBLIC cut off funds, thereby increasing Debtor's monthly revenue.

### B.   Sale Free and Clear of Liens Pursuant to Section 363(f)

16.     The Property is subject to security interests. The Debtor requests that the Property be sold free and clear of all security interests, lien claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code.   Any secured lien claims will attach to the proceeds of sale as determined by the Court.   The Debtor requests that the Court approve the sale of the Property free and clear of liens or interests, with such liens to attach to the proceeds therefrom, pursuant to Section 363(f) of the Bankruptcy Code, in an amount to be determined by the Court.

**WHEREFORE**, Debtor requests the Court enter an Order authorizing the sale of the

Property pursuant to the Contract attached as Exhibit A and for such other and further relief to

which Debtor may show himself justly entitled.

**DATED this 29th day of June, 2026.**

Respectfully submitted,

**THE MITCHELL LAW FIRM, L.P.**

**/s/    Gregory W. Mitchell**
Gregory W. Mitchell
1100 W. Campbell Road, Suite 200
Richardson, Texas   75080
(972)463-8417 – Office
(972)432-7540 – Facsimile
State Bar ID:   00791285
E-mail:   greg@mitchellps.com
PROPOSED ATTORNEYS FOR DEBTOR

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2026, a true and correct copy of the foregoing was served via U.S. Mail and/or ECF to the parties on the attached master mailing matrix.

/s/   **Gregory W. Mitchell**
Gregory W. Mitchell

Docusign Envelope ID: B8593388-E26B-85E3-835C-E01A4D8CA576

EXHIBIT

A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into as of February 4/15/2026 ___, 2026 (**"*Effective Date*"**), by and between the Seller and the Purchaser, each as defined in herein.

1. <u>Definitions</u>. The following capitalized terms as used in this Agreement have the following respective meanings:

"*Agreement*" means this Asset Purchase Agreement.

"*Assets*" is defined in Section 2 of this Agreement.

"*Closing*" means the closing of the sale of the Assets by Seller to Purchaser and the delivery by Purchaser of the Purchase Price and the Notes for the Assets to Seller in accordance with the terms of this Agreement.

"*Closing Conditions*" means the conditions to Purchaser's Closing as defined in Section 6 of this Agreement.

"*Closing Date*" means the calendar date on which the Closing occurs.

"*Counterparty*" means any counterparty to any of the Fiber Services Agreements.

"*Deliverables*" is defined in Section 5 of this Agreement.

"*Deposit*" means the aggregate amount of $100,000 previously wired by Purchaser to Seller, which Seller acknowledges has been received in full as of the Effective Date.

"*Fiber Services Agreements*" means each of the agreements referenced in Section 2(a)-(d) of this Agreement.

"*Outside Date*" means the outside date for the Closing Conditions to be met, which shall be September 30, 2026.

"*Projects*" means each community, subdivision, property or other development where Seller is to install fiber networks under the Fiber Services Agreement.

"*Purchaser*" means PRIVATE FIBER, INC., a Texas corporation, having an address for purposes of this agreement at 4841 Williams Dr. Ste 107, Georgetown, TX 78633.

"*Seller*" means NORTH TEXAS FIBER, INC., a Texas corporation, having an address for purposes of this agreement at 4550 Jimmy Doolittle Drive, Addison, TX 75001-3270.

"*Escrow Agent*" means Sneed & Vine LLP, Attorneys at Law, Austin, Texas, or such other escrow agent as the parties may mutually agree in writing.

Docusign Envelope ID: B8593388-E26B-85E3-835C-E01A4D8CA576

Case 26-32522-mvl11    Doc 33-4    Filed 06/29/26    Entered 06/29/26 21:02:40    Desc
Exhibit At-D - Proposed to Sell Contract Page 2 of 3933

"***Escrow Account***" means the interest-bearing escrow account established with the Escrow Agent for the deposit and disbursement of funds under the Short Term Note in accordance with Section 3 of this Agreement and the Escrow Agreement.

"***Escrow Agreement***" means that certain Escrow Agreement to be entered into by Purchaser, Seller and the Escrow Agent in connection with the deposit and release of funds under the Short Term Note.

"***Lien Release Conditions***" means the release and termination of (i) all UCC-1 financing statements filed by Liberty Bankers Life Insurance Company against the Assets, (ii) all outstanding obligations owed by Seller to Texas State Utilities, and (iii) all outstanding obligations owed by Seller to Momentum, each as evidenced by written releases, UCC-3 termination statements, or paid-in-full letters, as applicable, in form and substance reasonably satisfactory to Purchaser.

Other capitalized terms used in this Agreement have the meanings given in the place where first used.

2.    <u>Purchase and Sale of Assets</u>.  The Seller hereby agrees to sell to Purchaser, and Purchaser hereby agrees to purchase from Seller, subject to the terms, limitations and conditions set forth in this Agreement, the following items:

(a)    Seller's interest in that certain Kelly Ranch Estates NTF Service and Entry Agreement dated November 18, 2022 by and between Seller and Kelly Ranch Estates LLC for the project commonly known as Kelly Ranch Estates ("***Kelly Ranch Fiber Services Agreement***");

(b)    Seller'sinterest in that certain North Texas  Fiber Service and Entry Agreement 2023 dated February 3, 2023 by and between Seller and Cresson Estates HOA ("***Cresson Fiber Services Agreement***");

(c)    Seller's interest in that certain MDU Fiber Services Agreement (MDU Services Agreement) dated August 8, 2024 by and between Seller and Kent and Meg Conine ("***Greenville Fiber Services Agreement***");

(d)    Seller's interest in that certain MDU Fiber Services Agreement (MDU Services Agreement) dated February 10, 2024 by and between Seller and Sherman Park Apartments, LP ("***Sherman  Fiber Services Agreement***");

(e)    Any individual subscription agreements entered into by homeowners with Seller related to providing services to any consumers at the Projects, as well as all customer data related thereto.

(f)    All of Seller's network equipment, fiber infrastructure, materials, equipment and other similar items located anywhere at the Projects;

(g)    All of Seller's interest in that certain MASTER SERVICE AGREEMENT between Seller and all backhaul carrier providers.

(h)    All of Seller's customer agreements and intellectual property rights to extent existing related to the Projects.

(i)    All of Seller's existing claims, demands and equities existing and to exist in connection with any of the Projects.

**2 |** P a g e

Docusign Envelope ID: B8593388-E26B-85E3-835C-E01A4D8CA576

Case 26-32522-mvl11   Doc 33-4   Filed 06/29/26   Entered 06/29/26 21:02:40   Desc
Exhibit A - Proposed to Sell Contract   Page 7 of 33

(j)     All of Seller's records, reports and copies of all notices given by either Seller or any Counterparty related to the Projects.

All of the foregoing conveyed, transferred, assigned and delivered to the Purchaser are referred to collectively as the "**_Assets_**".

3.     <u>Purchase Price & Deposit</u>.  The purchase price for the Assets shall be established as of the Closing Date based on the calculation outlined on Exhibit A (the "Purchase Price").  The Purchase Price shall be paid to Seller in the form of: (i) **ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000.00)** (the "**_Cash Payment_**"); (ii) a promissory note in the amount of **NINE HUNDRED THOUSAND AND 00/100 DOLLARS ($900,000.00)** (the "**_Short Term Note_**") in the form attached hereto as Exhibit B; (iii) a deferred promissory note to pay, to the extent of Eligible Subscription Revenues (as defined on Exhibit C),  in an amount equal to the balance of the Purchase Price as may be adjusted from time to time as provided for herein in the form provided for on Exhibit C (the "**_Deferred Note_**") and (iv) issuance of Purchaser's Class B shares ("**_Shares_**")  in the amount listed on Exhibit D, to be issued at Closing subject to Seller's ongoing compliance with the Deliverables and other obligations under this Agreement as set forth on Exhibit D.   The Cash Payment has been wired by Purchaser and received by Seller in full as of the Effective Date.  Seller hereby acknowledges receipt of the Cash Payment in the aggregate amount of ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000.00), which constitutes the full Cash Payment and Deposit under this Agreement.  All amounts due under the Short Term Note shall be deposited by Purchaser into the Escrow Account.  Purchaser shall deposit SIX HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($650,000.00) into the Escrow Account within seventy-five (75) days of the Effective Date.  The remaining TWO HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($250,000.00) shall be deposited into the Escrow Account in accordance with the payment schedule set forth in Exhibit B.  Funds held in the Escrow Account shall be released to Seller only upon satisfaction of all Lien Release Conditions.  Upon satisfaction of the Lien Release Conditions, the Escrow Agent shall release the Six Hundred Fifty Thousand Dollars ($650,000.00) (or such portion thereof as has been deposited) to Seller.  The remaining Two Hundred Fifty Thousand Dollars ($250,000.00) shall be released to Seller upon deposit into the Escrow Account and confirmation that all Lien Release Conditions remain satisfied.  In the event the Lien Release Conditions are not satisfied within one hundred eighty (180) days of the Effective Date, Purchaser may, at its sole election, (a) extend the release period for an additional ninety (90) days, or (b) terminate this Agreement and receive a full refund of all amounts held in the Escrow Account.  Any payments under the Deferred Note shall be paid in immediately available funds by wire transfer or as otherwise agreed to by the parties.   Seller acknowledges that the value of the Shares is difficult to ascertain and is dependent upon factors, known and unknown by Purchaser, is highly speculative dependent on future performance of Purchaser, including related to the Projects, and the Shares may be difficult to liquidate and Seller acknowledges and agrees that Purchaser makes no representations or warranties related to the Shares.  The Shares shall be issued to Seller at Closing; provided, however, that in the event Seller is in default of any obligations hereunder, including under Section 12 related to the right of first refusal, or fails to satisfy the Deliverables set forth in this Agreement, Purchaser shall have the right to exercise its repurchase option as set forth in Exhibit D.  The Deposit has been paid in full and Seller acknowledges receipt thereof.  The Deposit shall be fully refundable to Purchaser in the event that the Closing does not occur for any or no reason.  In the event this Agreement is

**3 |** P a g e

Docusign Envelope ID: B8593389-E26B-85E3-835C-F01A4D8CA576

terminated prior to Closing, Seller shall refund the Deposit to Purchaser within thirty (30) business days of written demand by Purchaser.  In the event of Closing, the Cash Payment shall be deemed satisfied in full by the Deposit previously received by Seller.  Seller shall refund the Deposit to Purchaser within thirty (30) business days of written demand by Purchaser.

4. <u>Representations and Warranties of Seller</u>. As a material inducement to Purchaser to execute this Agreement and consummate this transaction and Closing of the purchase of the Assets, Seller represents and warrants to Purchaser as of the Effective Date  and continuing through and including the Closing Date as follows: Notwithstanding anything herein to the contrary, Seller hereby discloses that Liberty Bankers Life Insurance Company holds a UCC-1 financing statement filed against the Assets, which Seller shall cause to be released in accordance with Section 7(i) hereof.

(a) Seller is the legal and equitable owner of its interest in the Fiber Services Agreements and all rights and benefits arising thereunder.  Seller has not transferred, conveyed, assigned or otherwise impaired its interest in the Fiber Services Agreements.

(b) Seller is duly organized and validly existing as a Texas corporation.  Seller has the full right and authority to enter into this Agreement, consummate the transaction contemplated in this Agreement and to transfer and convey the Assets without the consent of any third party (other than the consent of any Counterparty under the Fiber Services Agreements to be obtained prior to Closing), and Seller has obtained all consents (if any) required for the Seller to perform its obligations under this Agreement.

(c) The person signing this Agreement on behalf of the Seller is authorized to do so. This Agreement and all of the documents to be delivered by the Seller at the Closing have been (or will be) authorized and properly executed and will constitute the valid and binding obligations of the Seller, enforceable against the Seller in accordance with their terms.  Seller has the requisite power and authority to execute, deliver and perform this Agreement.

(d) Seller's execution and performance of this Agreement will not violate the terms and conditions of any other agreement binding on Seller.

(e) Except as indicated in this Agreement, Seller has not heretofore sold, mortgaged, hypothecated, granted a security interest in or otherwise encumbered all or any portion of the Assets that will not be released as of the date hereof. Except for (i) the UCC-1 financing statement held by Liberty Bankers Life Insurance Company, which shall be released in accordance with Section 7(i), and (ii) an outstanding obligation to Texas State Utilities in the approximate amount of $46,000, Seller has not heretofore sold, mortgaged, hypothecated, granted a security interest in or otherwise encumbered all or any portion of the Assets.

(f) The Fiber Services Agreements have not been amended, modified, or assigned other than any assignments by a Counterparty as outlined on Exhibit E to a homeowners association as listed therein.   Seller has delivered to Purchaser full and accurate executed copies of each of the Fiber Services Agreements.

**4 |** P a g e

Docusign Envelope ID: B8593388-E26B-85E3-835C-E01A4D8CA576

Case 26-32522-mvl11    Doc 33-4    Filed 06/29/26    Entered 06/29/26 21:02:40    Desc
Exhibit D - Proposed to Sell Contract    Page 9 of 33

(g)    Seller has installed fiber optic lines in accordance with the Fiber Services Agreements in the Projects and Exhibit F accurately represents the progress of installation for each of the Projects as of the Effective Date.  Seller has not ceased efforts to install fiber optic lines under any of the Fiber Services Agreements.

(h)    Seller is not presently aware of, and has not received written notice from any Counterparty under the Fiber Services Agreements, any default or alleged default by Seller under the Fiber Services Agreements.  Seller is not presently aware of, and has not sent written notice to any Counterparty, any defaults by any Counterparty under the Fiber Services Agreements.

(i)    Seller is not presently aware of, and has not received written notice from Backhaul Carrier Providers  under the backhaul carriers MSAs , any default or alleged default by Seller under the Backhaul Carrier Providers MSAs.  Seller is not presently aware of and has not sent written notice to Backhaul Carrier Providers , any defaults by any Counterparty under the Backhaul Carrier Providers MSA.

(j)    Seller has not received any written notice of the filing of any bankruptcy proceedings by any Counterparty under the Fiber Services Agreements.

(k)    Seller is not aware of and has not received any written notice from any subcontractor, supplier, vendor, contractor or any other party that has performed services for Seller in regard to the Projects of any payment dispute or demand related to services provided.  Other than amounts paid at the time of Closing, if any, Seller is unaware of any outstanding amounts owed related to services provided related to the Assets. Notwithstanding the foregoing, Seller acknowledges that outstanding obligations or payment disputes may exist with respect to Momentum, Texas State Utilities, and Liberty Bankers Life Insurance Company, each of which Seller shall resolve or cause to be resolved prior to or at Closing.

(l)    The number of subscribers listed on Exhibit G is an accurate listing of subscribers currently making payments under the Fiber Services Agreements as of the Effective Date.

(m)    There is no action, suit or proceeding pending or, to the Seller's knowledge, threatened against the Seller related to the Assets, the Projects, any Counterparty or otherwise related to any of the foregoing. Notwithstanding the foregoing, Seller acknowledges that disputes, claims, or potential actions may exist involving Texas State Utilities, Liberty Bankers Life Insurance Company, and Momentum, which Seller has disclosed to Purchaser and shall resolve or cause to be resolved prior to or at Closing.

(n)    Seller has not received written notice that the installation by Seller of fiber optic lines under the Fiber Services Agreements or the use thereof violates any laws, rules and regulations of any federal, state, city or county government or any agency, body, or subdivision thereof having any jurisdiction over the foregoing.

(o)    This Agreement, the Assignment, and the Allonge constitute the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

**5 | Page**

The representations and warranties hereunder shall survive the Closing of the transaction contemplated hereunder. In the event Seller becomes aware of any change in any representation or warranty following the Effective Date, Seller shall provide prompt written notice to Purchaser. In addition to any and all rights and remedies available to Purchaser in the event any of the foregoing representations or warranties were inaccurate when made, Purchaser shall have the right to reduce the amount of the Deferred Note in the amount of any damages suffered by Purchaser resulting from the breach of such representations or warranties. Further, notwithstanding the issuance of Shares at Closing, Purchaser shall retain the right to exercise its repurchase option for the Shares so long as a representation or warranty relied upon by Purchaser was determined to be inaccurate when provided.

5.  Representations and Warranties of Purchaser. Purchaser hereby represents and warrants to Seller as follows, which representations and warranties are made as of Closing:

(a)  Purchaser is a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended. Purchaser may not assign this Agreement without the express written consent of Seller, except to a wholly owned subsidiary of Purchaser.

(b)  Purchaser, or its assigns, has full power and authority to accept the transfer and assignment of all interest conveyed by this Agreement.

(c)  Purchaser is duly organized and validly existing as a Texas corporation. Purchaser has the full right and authority to enter into this Agreement and consummate the transaction contemplated in this Agreement.

(c)  The person signing this Agreement on behalf of the Purchaser is authorized to do so. This Agreement and all of the documents to be delivered by the Purchaser at the Closing have been (or will be) authorized and properly executed and will constitute the valid and binding obligations of the Purchaser, enforceable against the Seller in accordance with their terms. Purchaser has the requisite power and authority to execute, deliver and perform this Agreement.

(d)  Purchaser's execution and performance of this Agreement will not violate the terms and conditions of any other agreement binding on Purchaser.

6.  Closing Conditions. The obligation of Purchaser to close the transaction described in this Agreement, shall be subject to the following conditions precedent:

(a)  The representations and warranties of Seller set forth in Section 4 of this Agreement shall be true and correct in all material respects as of the Effective Date and on the Closing Date.

(b)  Seller shall have performed or complied with all covenants, acts and agreements to be performed or complied with by Seller on or prior to the Closing Date in all material respects.

(c)  There shall be no litigation outstanding that prevents the sale of the Assets contemplated under this Agreement.

(d)　　Seller has provided an estoppel in a form acceptable to Purchaser from each Counterparty to the Fiber Services Agreement confirming the Fiber Services Agreements are in full force and effect, evidencing no defaults under the Fiber Services Agreements and other matters required by the Purchaser.

(e)　　For each Fiber Services Agreement where the Counterparty must consent to an assignment, a written form of consent from such Counterparty in a form acceptable to Purchaser;

(f)　　For each Fiber Services Agreement where subscriptions have commenced, Seller shall deliver an assignment and assumption agreement related to the Fiber Services Agreement whereby the applicable homeowners association agrees to be bound by the terms of the Fiber Services Agreement as a Counterparty thereunder. In addition, Seller shall obtain the written consent of Liberty Bankers Life Insurance Company to the assignment of each such Fiber Services Agreement, to the extent such consent is required under any security agreement or UCC filing held by Liberty Bankers Life Insurance Company.

(g)　　Related to Cresson Fiber Services Agreement, Seller shall obtain an amendment reflecting the Counterparty is in the legal name of the applicable name of the homeowner association.

(h)　　Backhaul Carrier Providers has consented to the assignment of the Backhaul Carrier Providers to Purchaser, or has entered into substantially similar agreements with Purchaser limited only to the Projects. Without limiting the generality of the foregoing, Seller shall obtain such consent or new agreements from United Cooperative Services and Momentum, as applicable Backhaul Carrier Providers for the Projects.

(i)　　Seller shall cause LIBERTY BANKERS INSURANCE Bankers Life Insurance to release any security interest, including any UCC-1, on all or any portion of the Assets. Seller shall satisfy all Lien Release Conditions, including resolving all outstanding obligations to Texas State Utilities and Momentum. Seller shall deliver to Purchaser evidence of satisfaction of the Lien Release Conditions, including UCC-3 termination statements and paid-in-full letters, as a condition to the release of any funds from the Escrow Account.

If any of the foregoing conditions are not satisfied or waived in writing by Purchaser by the Outside Date, Purchaser must give Seller written notice specifically setting forth the condition that has not been satisfied, and Seller shall have ten (10) days to cure such condition. If, however, at the end of such 10-day period, any of the foregoing conditions is still not satisfied, Purchaser may terminate this Agreement by written notice, in which latter event, both parties released from any further obligations or liabilities under this Agreement, except for those obligations and liabilities which expressly survive the termination of this Agreement. Purchaser may, but is not obligated to, waive any of the above Closing Conditions.

7.　　<u>Closing Deliverables.</u>　Closing shall be on the date that is five (5) business days following the satisfaction of the Closing Conditions, or such earlier time as the parties may mutually agree. At Closing, the parties shall deliver the following:

**7 |** P a g e

(a) Seller shall deliver the following:

    (i)    An assignment and assumption agreement in the form attached hereto as Exhibit H related to the Fiber Services Agreements executed by Seller ("***Assignment and Assumption Agreement***")

    (ii)    A Bill of Sale transferring all right, title and interest of Seller, if any and if transferable, in all remaining Assets, including any tangible personal property located at the Projects (the "***Bill of Sale***") in the form attached as Exhibit I.

    (iii)    Customer Notice form in a form approved by Purchaser to all existing customers at the Projects related to the assignment of the Assets to Purchaser directing customers to make future payments to Purchaser.

(b) Purchaser shall deliver the following to Seller:

    (i)    The Cash Payment shall be deemed paid in full by the wire transfers previously received by Seller as of the Effective Date.

    (ii)    The Short Term Note executed by Purchaser.

    (iii)    The Escrow Agreement executed by Purchaser, Seller and the Escrow Agent, providing for the deposit and release of all Short Term Note funds through the Escrow Account held by Sneed & Vine LLP, Austin, Texas.

    (iv)    The Deferred Note executed by Purchaser.

    (v)    A counterpart to the Assignment and Assumption Agreement executed by Purchaser.

Upon the delivery of the foregoing and consummation of Closing, the Assets shall be assigned to Purchaser. Seller shall cooperate with Purchaser and sign all documents reasonably necessary for Purchaser to effectuate the transfer of the Assets.

8.    <u>Prorations and Taxes</u>.  At Closing, Seller and Purchaser shall pro-rate for any and all revenues collected related to the month in which Closing occurs, with Seller being entitled to any revenues associated with any time period before Closing and Purchaser being entitled to any amounts related to the Closing Date and thereafter.  Any credit owed to Purchaser shall reduce the Cash Payment to be paid by Purchaser.  At Closing, Seller shall pay any and all outstanding amounts owed to any vendor, contractor, supplier or similar party and provide evidence thereof to Purchaser.  Any amounts owed under the Backhaul Carrier Providers  shall be prorated as of Closing between the parties.  Purchaser shall also receive as a credit (applied to the Escrow Account) an amount equal to all customer deposits being held by Seller.  All federal, state, local, and foreign income, excise, sales, use, and other taxes and assessments ("***Taxes***") that are due and payable by Seller or on behalf of Seller have been properly computed, duly reported, fully paid, and discharged.  There are no unpaid Taxes that are or could become a lien on the Assets, except for current Taxes not yet due and payable.  Seller shall be responsible for any and all Taxes owed related to the transaction contemplated hereunder, including any income tax on the Purchase Price.

9.    <u>Notification to Customers and Counterparties</u>.  Purchaser shall notify the Counterparties and any individual subscribers promptly after Closing of Purchaser's purchase of the Assets and direct that all payments on and communications regarding the Assets be sent to

**8** | P a g e

Docusign Envelope ID: B8593388-E26B-85E3-835C-E01A4D8CA576

Purchaser after Closing. After Closing, Purchaser shall have the right to collect all amounts due in connection with the Assets.  After Closing, in the event Seller receives any payment or amount due and owing on the Assets by any Counterparty or customers, Seller will promptly remit such payment to Purchaser.

10.    Pre-Closing Covenants and Post-Closing Cooperation. Prior to Closing, Seller agrees to continue performing in the ordinary course any and all activity, including installation under the Fiber Services Agreements and payment of any and all expenses related thereto.  Seller agrees to cooperate with Purchaser in the transition of the Assets post-Closing and shall make itself reasonably available to Purchaser in coordinating with each Counterparty to have Purchaser resume any installation activities at the Projects.   Additionally, Seller agrees to assist Purchaser for a period of up to six months in continuing to bill individual subscribers and to remit payments as received to Purchaser.

Purchaser shall have a period of six (6) months from the Closing Date (the "***Migration Period***") to complete the migration of all services, circuits, backhaul connections, and network infrastructure from Seller's systems to Purchaser's systems.  During the Migration Period, Seller shall cooperate in good faith with Purchaser to ensure continuity of service to all subscribers and shall not terminate, disconnect, or otherwise interrupt any circuits, backhaul services, or network connections serving the Projects without Purchaser's prior written consent.  In the event Purchaser encounters technical difficulties, carrier coordination delays, or other circumstances beyond Purchaser's reasonable control that prevent completion of the migration within the initial six-month Migration Period, Purchaser may extend the Migration Period for an additional ninety (90) days by providing written notice to Seller prior to the expiration of the initial Migration Period (the "***Extended Migration Period***").  Seller's obligations under this Section 10 with respect to cooperation, service continuity, and non-interruption shall continue through the Extended Migration Period if invoked.

11.    Default/Remedies

(a)    If Purchaser should fail to consummate the transaction herein contemplated for any reason, except default by Seller, then Seller shall be entitled, as Seller's sole and exclusive remedy to terminate this Agreement whereupon neither party shall have any further rights or obligations hereunder.

(b)    If Seller should fail to consummate the transaction herein contemplated for any reason, except Purchaser's default or the exercise of a right of termination herein granted to Seller, then Purchaser shall be entitled to terminate this Agreement, whereupon neither party shall have any further rights or obligations hereunder.

(c)    If it shall be necessary for either Purchaser or Seller to employ an attorney to enforce its rights pursuant to this Agreement, the party prevailing in any final judgment shall be entitled to reimbursement by the other party for all reasonable costs, charges and expenses, including attorney's fees, expended or incurred in connection therewith.

**9 |** P a g e

Docusign Envelope ID: B8593388-E26B-85E3-835C-E01A4D8CA576

13. **WAIVER OF TRIAL BY JURY; VENUE**. EACH PARTY TO THIS AGREEMENT HEREBY VOLUNTARILY, KNOWINGLY AND IRREVOCABLY WAIVES ANY CONSTITUTIONAL OR OTHER RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN THE EVENT OF LITIGATION CONCERNING ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER OR IN ANY WAY CONNECTED WITH OR RELATED TO OR INCIDENTAL TO THIS AGREEMENT, THE PARTIES' PERFORMANCE HEREUNDER OR UNDER ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH (INCLUDING, WITHOUT LIMITATION, THE DELIVERABLES). THE EXCLUSIVE VENUE FOR ANY LEGAL PROCEEDING OR DISPUTE ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE IN THE COURTS OF THE STATE OF TEXAS, DALLAS COUNTY, OR IN THE UNITED STATES COURTS LOCATED IN THE NORTHERN DISTRICT OF TEXAS. THE PARTIES WAIVE ANY DEFENSES TO SUCH VENUES, AND CONSENT TO THE JURISDICTION OF THE SAID COURTS.

14. Further Assurances. At the request of Purchaser, Seller shall execute, deliver and acknowledge, from time to time, such further assignments, instruments, notices and other documents and do such other things as may be reasonably necessary to effectuate and complete the transfer and assignment made and intended to be made by this Agreement, specifically including, but not limited to, any further instruments that may be reasonably necessary to make fully effective and perfect this Agreement.

15. Counterparts. This Agreement may be executed in multiple counterparts. Each of the counterparts hereof so executed shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

16. Entire Agreement. This Agreement and the documents referred to herein constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and no party shall be liable or bound to any other party in any manner by any warranties, representations or covenants except as specifically set forth herein or therein. This Agreement and the documents contemplated herein supersede all correspondence and discussions previously exchanged in connection with the negotiations surrounding the subject matter hereof. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any third party any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

17. Governing Law. THE VALIDITY, CONSTRUCTION AND ENFORCEMENT OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS.

18. Conflict. In the event of a conflict between the terms of this Agreement and the terms of any agreement executed in conjunction herewith, the terms of this Agreement shall control.

**10 |** P a g e

Docusign Envelope ID: B8593388-E26B-85E3-835C-E01A4D8CA576

19.     <u>Time of the Essence</u>.  The parties specifically acknowledge that time is of the essence in connection with this Agreement.

20.     <u>Confidentiality</u>.  Seller and Purchaser agree not to cause any public announcements to be made of the execution of this Agreement or the Closing of this transaction, and further agree not to disclose to any party the terms or conditions contained herein, including, without limitation, the Purchase Price payable hereunder.  Purchaser and Seller shall keep and maintain the existence of this Agreement, its terms and conditions, and the results of Purchaser's inspection of the Assets confidential.  Seller and Purchaser further agree not to disclose to any unrelated third party any of the facts concerning the execution and delivery of this Agreement or the consummation of the purchase and sale contemplated hereby.  Notwithstanding the foregoing, if required by applicable law, Seller and Purchaser may disclose any aspect of this transaction to any governmental agency, or any officer thereof, upon proper request and requirement therefor, and Seller and Purchaser may disclose any aspect of this transaction to their respective attorneys, accountants, lenders, directors, trustees, regulators, managers and employees.  The obligations of Purchaser and Seller under this Section 20 shall survive the termination of this Agreement.

21.     <u>Authority of Signatories</u>.  All persons signing below covenant that they possess the necessary capacity and authority, including but not limited to the authority to bind their respective entities based on board of director or other approval, to sign and enter into this Agreement.

22.     <u>Miscellaneous</u>.  This Agreement shall not be assigned by Purchaser, except to a subsidiary which is wholly owned by Purchaser, without the express written consent of Seller. The provisions of this Agreement are for the sole benefit of the parties hereto, and shall not give rise to any rights by or on behalf of anyone else.  No waiver by any party of any other's breach of any term or condition of this Agreement shall be deemed to be a waiver of any subsequent breach of the same or any other term or condition of this Agreement.  Nothing herein contained shall be deemed or construed to create a partnership or joint venture or agency relationship between the parties hereto, and Purchaser shall not take any action that could reasonably lead a third party to assume that Purchaser has the authority to bind or act for Seller.  This Agreement may be amended or modified only by a written instrument executed by both of the parties. This Agreement may be executed in two or more counterparts, each of which shall be deemed to constitute an original, but all of which, when taken together, shall constitute one and the same instrument, with the same effect as if all of the parties to this Agreement had executed the same counterpart.  Any electronically imaged signature of either party shall have the same force and effect as an original signature without requiring the production of an original signature.

At any time or from time to time after the Closing, the parties shall execute and deliver to the other party such other documents and instruments, provide such materials and information and take such other actions as the other party may reasonably request to consummate the transactions contemplated by this Agreement and otherwise to cause the other party to fulfill its obligations under this Agreement and the transactions contemplated hereby. Each party agrees to use commercially reasonable efforts to cause the conditions to its obligations to consummate the transactions contemplated by this Agreement.

[SIGNATURE PAGE FOLLOWS]

Docusign Envelope ID: B8593389-E26B-85E3-835C-E01A4D8CA576

Docusign Envelope ID: B8593389-E26B-85E3-835C-E01A4D8CA576

WITNESS THE SIGNATURES of the parties effective as of the date first set forth above.

**SELLER:**

NORTH TEXAS FIBER INC., a Texas corporation

By:_____

Name:_____
Nick Costas

Title:_____
CEO

**PURCHASER:**

PRIVATE FIBER, INC., a Texas corporation

By:_____

Name:_____
Nathan Chessher

Title:_____
CEO

Docusign Envelope ID: B8593389-E26B-85E3-835C-F01A4D8CA576

EXHIBIT A

PURCHASE PRICE

The Purchase Price is calculated as follows:

**Valuation Metric Per Unit.**

Related to the single family residential (Cresson Estates and Kelly Ranch) Projects, an amount equal to: $2,500 for each current active subscriber; $625 per passed home (which Seller has completed the fiber optic extension past such lot); and $188 per contracted home in such Projects.

A MDU (Greenville and Sherman Projects), an amount equal: to $600 Passed unit, $250 per Contracted unit, and $2,500 Per Each Current Subscriber

The formula shall be without duplication, so for a house that has an active subscription, the purchase price related to that house shall exclude any portion related to contracted lot and "passed lot".

Single Family Units: (updated Contract )

| Metric | 25 Yr Contract $49.99/mo | 25 Yr Contract $79.99/mo |
|---|---|---|
| Value per Contracted Home | $188 | $300 |
| Value per Active Subscriber | $2,500 | $4,000 |
| Value of Passed Homes | $625 | $1,000 |

Multi Dwelling Units:

| MDU Rate | | Notes |
|---|---|---|
| $250 | | Contracted |
| $2,500 | | Subscriber |
| $600 | | Passed Home |

The Purchase Price is paid as follows: (i) $100,000 Cash Payment (wired and received as of the Effective Date); (ii) $900,000 to be subject to the Short Term Note, with all amounts deposited into the Escrow Account held by Sneed & Vine LLP, Austin, Texas ($650,000 within 75 days of the Effective Date; $250,000 per the schedule in Exhibit B), released to Seller upon satisfaction of all Lien Release Conditions; and (iii) the remainder in the Deferred Note.  The current anticipated Purchase Price is below:

| Community | BSA Homes | Contracted Remaining | Subscribers | Passed Only | Tier | Contract Val | Subscriber Val | Passed Val | | TOTAL VALUE | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cresson Estates (161 passed / 1,496 BSA) | 1,496 | 1,200 | 135 | 161 | $49.99 | $225,600 | $337,500 | $100,625 | | $663,725 | Active |
| Kelly Ranch (245 passed / 2,000 BSA) | 2,000 | 1,755 | 50 | 195 | $49.99 | $329,940 | $125,000 | $121,875 | | $576,815 | Active |
| Sherman Park MDU (276 passed / 600 BSA) | 600 | 324 | 140 | 136 | MDU | $81,000 | $350,000 | $81,600 | | $512,600 | Active |
| Greenville Village MDU (323 BSA) | 323 | 0 | 19 | 304 | MDU | $0 | $47,500 | $182,400 | | $229,900 | Active |
| SFU SUBTOTAL (Cresson + Kelly) | 3,496 | 2,955 | 185 | 356 | | $555,540 | $462,500 | $222,500 | | $1,240,540 | |
| MDU SUBTOTAL (Sherman + Greenville) | 923 | 324 | 159 | 440 | | $81,000 | $397,500 | $264,000 | | $742,500 | |
| PHASE I TOTAL PURCHASE PRICE | 4,419 | 3,279 | 344 | 796 | | $636,540 | $860,000 | $486,500 | | $1,983,040 | |

**Purchase Price $1,983,040 Breakdown (based on above numbers, subject to adjustment at Closing)**

Cash Payment:        $100,000
Short Term Note:       $900,000
Deferred Note*:        $983,040

* Deferred Note amount subject to adjustment as provided for in Exhibit C

Docusign Envelope ID: B8593389-E26B-85E3-835C-E01A4D8CA576

Case 26-32522-mvl11   Doc 33-4   Filed 06/29/26   Entered 06/29/26 21:02:40   Desc
Exhibit A - Proposed Contract   Page 20 of 3933

| Component | | Amount | Shares Pledged | Share Value | Class | Repayment Terms / Trigger |
|---|---|---|---|---|---|---|
| Cash at Closing | | $100,000 | — | — | — | Due at closing; no collateral required |
| Promissory Note | | $900,000 | 1,000,000 | $1,100,000 | Class A | Pay $900K in full → 1M Class A shares released back to Private Fiber |
| Seller's Note (Phase I) | | $983,040 | 416,925 | $458,618 | Class B | No interest; repaid via tiered revenue share (15%/25%/50%) — Class B @ 150 shares/home |
| **TOTAL PHASE I ACQUISITION** | | **$1,983,040** | **1,416,925** | **$1,558,618** | **A + B** | **1,000,000 Class A + 416,925 Class B = 1,416,925 Total Shares** |

## EXHIBIT B
## PROMISSORY NOTE

[$900,000]                                                                     ___, 2026

FOR VALUE RECEIVED, PRIVATE FIBER, INC., a Texas corporation ("Borrower"), promises to pay to the order of NORTH TEXAS FIBER, INC., a Texas corporation ("Lender"), the principal sum of **[NINE HUNDRED THOUSAND DOLLARS AND NO/100 CENTS ($900,000.00)]** or such lesser amount as shall have been advanced and be outstanding hereunder. All sums hereunder shall be deposited by Borrower into the Escrow Account held by Sneed & Vine LLP, Attorneys at Law, Austin, Texas (the "Escrow Agent"), in accordance with the Escrow Agreement and Section 3 of the APA.  Borrower shall deposit Six Hundred Fifty Thousand Dollars ($650,000.00) into the Escrow Account within seventy-five (75) days of the Effective Date of the APA.  The remaining Two Hundred Fifty Thousand Dollars ($250,000.00) shall be deposited into the Escrow Account in accordance with the payment schedule set forth herein.  Funds held in the Escrow Account shall be released to Lender only upon satisfaction of the Lien Release Conditions (as defined in the APA), including the release of all UCC-1 financing statements filed by Liberty Bankers Life Insurance Company, and the resolution of all outstanding obligations to Texas State Utilities and Momentum.  All payments and prepayments made hereunder shall be made in lawful currency of the United States of America and in immediately available funds, subject to the escrow deposit and release provisions of this Promissory Note and the APA.

1.      Non-Revolving Promissory Note.  The indebtedness evidenced by this Promissory Note is not a revolving credit, and principal borrowed hereunder and repaid may not be reborrowed.  All payments of principal under this Promissory Note shall reduce the unpaid balance of principal due hereunder but shall not extinguish this Promissory Note until the entire principal balance has been paid in full.

Docusign Envelope ID: B8593388-E26B-85E3-835C-E01A4D8CA576

Case 26-32522-mvl11    Doc 33-4    Filed 06/29/26    Entered 06/29/26 21:02:40    Desc
Exhibit A - Proposed to Sell Contract    Page 21 of 39

2.    <u>Collateral.</u>  This Promissory Note shall be due and payable in full upon Borrower completing a capital funding round or other corporate financing event that provides sufficient proceeds to satisfy the outstanding balance hereunder ("Qualifying Financing Event").  There shall be no interest owed hereunder.  This Promissory Note may be prepaid at any time without penalty.  As collateral for the obligations hereunder, Borrower hereby designates 1,000,000 of its unissued Class A shares (the "Collateral Shares") for the benefit of Lender.  Upon repayment in full of this Promissory Note, the collateral designation of the Collateral Shares shall automatically terminate and be of no further force or effect, and the Collateral Shares shall be fully released and returned to Borrower's unrestricted authorized capital for use in connection with future funding rounds, capital equity raises, or any other corporate purpose at Borrower's sole discretion.  Lender agrees to execute any documents reasonably requested by Borrower to evidence such release.

3.    <u>Waiver.</u>  Borrower and other party now or hereafter liable for the payment of any sums of money payable on this Promissory Note, hereby severally (a) waive, demand, presentment for payment, notice of dishonor, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices, filing of suit and diligence in collecting this Promissory Note or enforcing any security with respect to same, (b) agree to any substitution, subordination, exchange or release of any security for this Promissory Note or the release of any parties primarily or secondarily liable hereon, (c) agree that Lender shall not be required first to institute suit or exhaust its remedies hereunder against Borrower, or others liable or to become liable hereon, prior to Lender's enforcement of its rights against them or any security with respect to same, (d) consent to any and all renewals, extensions, releases, indulgences, releases or changes regardless of the number of such renewals, extensions, indulgences, releases or changes without notice hereof, and (e) agree to the application of any deposit balance with Lender as payment or part payment hereon or as an offset hereto.  No waiver by Lender of any of its rights or remedies hereunder or under any other document evidencing or securing this Promissory Note or otherwise shall be considered a waiver of any other subsequent right or remedy of Lender; no delay or omission in the exercise or endorsement by Lender of any rights or remedies shall ever be construed as a waiver of the same or any other right or remedy of Lender; and no exercise or enforcement of any such right or remedy shall ever be held to exhaust any right or remedy of Lender.

4.    <u>Attorneys' Fees and Cost of Collection.</u>  If this Promissory Note is not paid when due and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy or any other court, then Lender shall be entitled to reasonable and documented attorneys' fees and other costs of collection.

5.    **<u>Governing Law/Venue.</u>  THIS PROMISSORY NOTE SHALL BE DEEMED A CONTRACT AND INSTRUMENT MADE UNDER THE LAWS OF THE STATE OF TEXAS AND ACCEPTED BY LENDER IN SAID STATE, THE LOCATION OF LENDER'S PRINCIPAL PLACE OF BUSINESS, AND ANY AND ALL CLAIMS, DEMANDS OR ACTIONS IN ANY WAY RELATING THERETO OR INVOLVING ANY DISPUTE BETWEEN ANY OF THE PARTIES TO THIS PROMISSORY NOTE, WHETHER ARISING IN CONTRACT OR TORT, AT LAW, IN EQUITY OR STATUTORILY, SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND/OR GOVERNED BY THE LAWS OF THE STATE OF TEXAS (EXCEPTING ITS**

Docusign Envelope ID: B8593389-E26B-85E3-835C-E01A4D8CA576

**CHOICE OF LAW RULES) AND THE LAWS OF THE UNITED STATES OF AMERICA. BORROWER HEREBY IRREVOCABLY SUBMITS ITSELF TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF TEXAS AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON IT IN ANY LEGAL PROCEEDING RELATING TO THE LOAN DOCUMENTS, THE RELATIONSHIP CREATED THEREBY OR THE DEBT BY ANY MEANS ALLOWED UNDER TEXAS OR FEDERAL LAW. VENUE FOR ANY LEGAL PROCEEDING SHALL BE DALLAS COUNTY, TEXAS; PROVIDED, HOWEVER, THAT LENDER MAY CHOOSE ANY VENUE IN ANY STATE WHICH IT DEEMS APPROPRIATE IN THE EXERCISE OF ITS SOLE DISCRETION.**

EXECUTED effective as of the day and year first above written.

**BORROWER:**

PRIVATE FIBER, INC., a Texas corporation

Signed by:

By: _____
E24D25046B0049A...

Name: _____Nathan Chessher_____

Its: _____CEO_____

SWDocID

EXHIBIT C
Form of Deferred Note

**<u>PROMISSORY NOTE</u>**

[_____4/15/2026_____]                                                   ____, 2026

FOR VALUE RECEIVED, PRIVATE FIBER, INC., a Texas corporation ("<u>Borrower</u>"), promises to pay to the order of NORTH TEXAS FIBER, INC., a Texas corporation ("<u>Lender</u>"), on or before the date that is four (4) years after the date hereof (or next business day (the "<u>Maturity Date</u>"), the principal sum of [___$983,040_____] or such lesser amount as shall have been advanced and be outstanding hereunder. All sums hereunder are payable to Lender at such location as Lender may designate in writing from time to time, in lawful currency of the United States of America and in immediately available funds. All payments and prepayments made hereunder shall be made without setoff, counterclaim, or deduction of any kind, except as expressly provided in Section 4 of the APA with respect to adjustments for breach of representations and warranties. Borrower and Lender are parties to that certain Asset Purchase Agreement dated February ___ 2026 (the "APA"; all capitalized terms used herein not defined herein shall have the meaning provided for in the APA).

1.      <u>Non-Revolving Promissory Note.</u> The indebtedness evidenced by this Promissory Note is not a revolving credit, and principal borrowed hereunder and repaid may not be reborrowed. All payments of principal under this Promissory Note shall reduce the unpaid balance of principal due hereunder but shall not extinguish this Promissory Note until the entire principal balance has been paid in full.

2.      <u>Interest, Prepayment and Collateral.</u> There shall be no interest owed hereunder. This Promissory Note may be prepaid at any time without penalty.

3.      <u>Payments.</u> Borrower shall only owe amounts under this Promissory Note based on the performance of the Assets (as defined in the APA) acquired by Borrower from Lender in accordance with Exhibit A attached hereto. No amounts shall be owed by Borrower hereunder until Borrower has obtained subscriptions from residents in the Project in the amount required for Tier 1 as listed on Exhibit A. Upon achieving the minimum subscriptions to meet Tier 1, thereafter the Borrower shall pay to Lender on a quarterly basis equal to the Revenue Share percentage listed on Exhibit A multiplied by the revenues actually received by Purchaser less operating expenditures related to subscriptions at the Projects during such quarter (the "Eligible Subscription Revenues"). Each payment made to Lender shall reduce the principal amount under this Promissory Note. Borrower shall determine the amount within forty-five (45) days of each calendar quarter after achieving the number of subscriptions needed to be in Tier 1 as listed on Exhibit A. The Revenue Share percentage on Exhibit A shall increase as noted on Exhibit A. All listed subscription numbers, rates and anticipated milestones are merely for illustrative purposes. Borrower makes no representation as to the likelihood of achieving the subscriptions and revenues listed on Exhibit A. Lender, by acceptance hereof, acknowledges and agrees that the amounts owed hereunder are contingent on revenues actually received by Borrower related to the Assets acquired and it is not

SWDocID

Docusign Envelope ID: B8593389-E26B-85E3-835C-E01A4D8CA576

certain that the entire principal amount of this Promissory Note will be paid to Lender. Notwithstanding anything else herein, if on the Maturity Date, the full principal has not been paid in accordance with the terms hereunder, such amounts shall be forgiven by Lender on the Maturity Date.

4.  Adjustments in Principal Amount.  Under the APA, the amount of this Promissory Note was based on a certain value for contracted lots under the Fiber Services Agreement in anticipation of the developers under the Projects which may or may not be developed.  In the event that any lots that were contracted for and factored into the Purchase Price are not developed by January 1, 2030, or the Borrower has a reasonable basis to believe that such lots will not be developed, then the amount of the principal amount of this Promissory Note shall be reduced by the amount of the Purchase Price allocated to each contracted home ($300 each) that is not eventually developed.  In the event the rates under the subscription agreements for the Projects are materially increased or the terms of the Fiber Services Agreements materially extended, Borrower may review and propose to Lender any adjustment to increase the principal amount of this Promissory Note.  Further, the principal amount shall also be reduced for any damages incurred by Borrower related to the breach of the representations and warranties by Lender under Section 4 of the APA.  The reductions in this Section 4 are in addition to any reductions resulting from payments made in Section 3.

5.  Waiver.  Borrower and other party now or hereafter liable for the payment of any sums of money payable on this Promissory Note, hereby severally (a) waive, demand, presentment for payment, notice of dishonor, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices, filing of suit and diligence in collecting this Promissory Note or enforcing any security with respect to same, (b) agree to any substitution, subordination, exchange or release of any security for this Promissory Note or the release of any parties primarily or secondarily liable hereon, (c) agree that Lender shall not be required first to institute suit or exhaust its remedies hereunder against Borrower, or others liable or to become liable hereon, prior to Lender's enforcement of its rights against them or any security with respect to same, (d) consent to any and all renewals, extensions, releases, indulgences, releases or changes regardless of the number of such renewals, extensions, indulgences, releases or changes without notice hereof, and (e) agree to the application of any deposit balance with Lender as payment or part payment hereon or as an offset hereto.  No waiver by Lender of any of its rights or remedies hereunder or under any other document evidencing or securing this Promissory Note or otherwise shall be considered a waiver of any other subsequent right or remedy of Lender; no delay or omission in the exercise or endorsement by Lender of any rights or remedies shall ever be construed as a waiver of the same or any other right or remedy of Lender; and no exercise or enforcement of any such right or remedy shall ever be held to exhaust any right or remedy of Lender.

6.  Attorneys' Fees and Cost of Collection.  If this Promissory Note is not paid when due and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy or any other court, then Lender shall be entitled to reasonable and documented attorneys' fees and other costs of collection.

SWDocID

Docusign Envelope ID: B8593388-E26B-85E3-835C-F01A4D8CA576

7. **Governing Law/Venue.** **THIS PROMISSORY NOTE SHALL BE DEEMED A CONTRACT AND INSTRUMENT MADE UNDER THE LAWS OF THE STATE OF TEXAS AND ACCEPTED BY LENDER IN SAID STATE, THE LOCATION OF LENDER'S PRINCIPAL PLACE OF BUSINESS, AND ANY AND ALL CLAIMS, DEMANDS OR ACTIONS IN ANY WAY RELATING THERETO OR INVOLVING ANY DISPUTE BETWEEN ANY OF THE PARTIES TO THIS PROMISSORY NOTE, WHETHER ARISING IN CONTRACT OR TORT, AT LAW, IN EQUITY OR STATUTORILY, SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND/OR GOVERNED BY THE LAWS OF THE STATE OF TEXAS (EXCEPTING ITS CHOICE OF LAW RULES) AND THE LAWS OF THE UNITED STATES OF AMERICA. BORROWER HEREBY IRREVOCABLY SUBMITS ITSELF TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF TEXAS AND AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON IT IN ANY LEGAL PROCEEDING RELATING TO THE LOAN DOCUMENTS, THE RELATIONSHIP CREATED THEREBY OR THE DEBT BY ANY MEANS ALLOWED UNDER TEXAS OR FEDERAL LAW. VENUE FOR ANY LEGAL PROCEEDING SHALL BE DALLAS COUNTY, TEXAS; PROVIDED, HOWEVER, THAT LENDER MAY CHOOSE ANY VENUE IN ANY STATE WHICH IT DEEMS APPROPRIATE IN THE EXERCISE OF ITS SOLE DISCRETION.**

SWDocID

EXECUTED effective as of the day and year first above written.

**BORROWER:**

PRIVATE FIBER, INC., a Texas corporation

By: _____
Name: _____Nathan Chessher_____
Its: _____CEO_____

Docusign Envelope ID: B8593399-E26B-85E3-835C-E01A4D8CA576

## **Exhibit A**
Deferred Note Payment Summary

Attached.

### TIERED REVENUE SHARE — PHASE I SELLER'S NOTE REPAYMENT

| Tier | Subscriber Range | Rev Share % | Est. Trigger | Monthly NTF Share | Annual NTF Share |
|------|------------------|-------------|--------------|-------------------|------------------|
| Tier 0 | 0 — 1,499 | 0% | Close — Q1/Q2 2027 | $0 | $0 |
| Tier 1 | 1,500 — 2,499 | 15% | Q2 — Q3 2027 | ~$18,000 | ~$216,000 |
| Tier 2 | 2,500 — 3,999 | 25% | Q4 2027 — Q1 2028 | ~$50,000 | ~$600,000 |
| Tier 3 | 4,000+ | 50% | Q2 — Q4 2028 | ~$160,000+ | ~$1.9M+ |

Based on the total of subscribers for Private Fiber
Calculated based on Gross minus backhaul

**ESTIMATE QUARTERLY PROJECTION — SELLER'S NOTE PAYDOWN**

| Quarter | Est. Subs | Sub Range | Active Tier | Rev Share % | Qtr Revenue | NTF Share | Cumulative | Note Balance | % Repaid |
|---------|-----------|-----------|-------------|-------------|-------------|-----------|------------|--------------|----------|
| Q1 2026 | 385 | 385 | 0% | 0% | $92,388 | $0 | $0 | $1,186,245 | 0.0% |
| Q2 2026 | 850 | 400-500 | 0% | 0% | $203,975 | $0 | $0 | $1,186,245 | 0.0% |
| Q3 2026 | 1,225 | 1225-1400 | 0% | 0% | $293,963 | $0 | $0 | $1,186,245 | 0.0% |
| Q4 2026 | 1,650 | 1650-1800 | 15% | 15% | $395,951 | $59,393 | $59,393 | $1,126,852 | 5.0% |
| Q1 2027 | 1,900 | 1900-2250 | 15% | 15% | $455,943 | $68,391 | $127,784 | $1,058,461 | 10.8% |
| Q2 2027 | 2,300 | 2300-2500 | 15% | 15% | $551,931 | $82,790 | $210,574 | $975,671 | 17.8% |
| Q3 2027 | 2,800 | 2800-3000 | 15% | 15% | $671,916 | $100,787 | $311,361 | $874,884 | 26.2% |
| Q4 2027 | 3,200 | 3200-3500 | 25% | 25% | $767,904 | $191,976 | $503,337 | $682,908 | 42.4% |
| Q1 2028 | 3,600 | 2600-3900 | 25% | 25% | $863,892 | $215,973 | $719,310 | $466,935 | 60.6% |
| Q2 2028 | 4,100 | 4100-4400 | 25% | 25% | $983,877 | $245,969 | $965,279 | $220,966 | 81.4% |
| Q3 2028 | 4,650 | 4650-4900 | 50% | 50% | $1,115,861 | $220,966 | $1,186,245 | $0 | 100.0% |
| Q4 2028 | 5,100 | 5100-5500 | 50% | 50% | $1,223,847 | $0 | $1,186,245 | $0 | 100.0% |
| Q1 2029 | 6,200 | 6,000-6,400 | 50% | 50% | $1,487,814 | $0 | $1,186,245 | $0 | 100.0% |

SWDocID

Docusign Envelope ID: B8593388-E26B-85E3-835C-E01A4D8CA576

EXHIBIT D

Shares and Issuance

At Closing, Purchaser shall cause to be issued to Seller 416,925 of Purchaser's Class B shares (the "***Shares***"). The Shares shall be fully vested as of the Closing Date.  As a condition to the continued retention of the Shares by Seller, all Fiber Services Agreements must remain in full force and effect, Seller must satisfy all Deliverables required under this Agreement, and Seller shall not be in default under the Agreement, including any breach of representations or warranties.  In the event Seller fails to satisfy the foregoing conditions, Purchaser shall have the right to exercise its repurchase option as set forth below.

| Community | BSA Homes | Total Passed | Contract Shares (75/home) | Passed Shares (75/home) | Total Class B Shares | Class B Value | Status |
|---|---|---|---|---|---|---|---|
| Cresson Estates | 1,496 | 296 | 112,200 | 22,200 | 134,400 | $147,840 | Active |
| Kelly Ranch | 2,000 | 245 | 150,000 | 18,375 | 168,375 | $185,213 | Active |
| Sherman Park MDU | 600 | 276 | 45,000 | 20,700 | 65,700 | $72,270 | Active |
| Greenville Village MDU | 323 | 323 | 24,225 | 24,225 | 48,450 | $53,295 | Active |
| PHASE I CLASS B TOTAL | 4,419 | 1,140 | 331,425 | 85,500 | 416,925 | $458,618 | |

Related to the Class B Shares, Purchaser shall retain a repurchase option for the Shares after issuance to Seller. After issuance, Purchaser shall have the right at any time to re-purchase the Shares upon providing written notice to Seller and such re-purchase shall be at Fair Market Value.   Purchaser and Seller shall attempt in good faith to agree upon the Fair Market Value of the Shares within thirty (30) days of the Notice, as applicable.  If the parties cannot agree on Fair Market Value within 30 days, an independent third-party business appraiser shall be engaged by the parties to determine the Fair Market Value. The appraiser shall be mutually selected by Seller and Purchaser. If the parties cannot agree on an appraiser within fifteen (15) days, a reputable regional accounting firm selected by Purchaser shall appoint one familiar with businesses similar in nature to the Purchaser. The appraiser shall deliver a written Fair Market Value determination within forty-five (45) days of engagement. The appraiser's determination shall be final and binding on both parties.

SWDocID

EXHIBIT E

Prior Assignments of Fiber Services Agreements to Homeowners Associations

The following Bulk Services Agreements ("**BSAs**") constitute the Fiber Services Agreements referenced in Section 2(a)-(d) of this Agreement.  Seller shall assign each BSA to Purchaser upon execution of this Agreement, or within five (5) to seven (7) business days of execution, whichever occurs first.  Each assignment shall be documented via a fully executed Assignment and Assumption Agreement in the form attached hereto as Exhibit H.

**BSA Assignments Required at or Within 5-7 Business Days of Execution:**

**1.  Cresson Estates** — North Texas Fiber Service and Entry Agreement 2023 dated February 3, 2023, by and between Seller and Cresson Estates HOA.  BSA Homes: 1,496.  Homes Passed: 161.  This BSA shall be assigned to Purchaser in its entirety, including all rights, obligations, and benefits arising thereunder.

**2.  Kelly Ranch Estates** — Kelly Ranch Estates NTF Service and Entry Agreement dated November 18, 2022, by and between Seller and Kelly Ranch Estates LLC.  BSA Homes: 2,000. Homes Passed: 245.  This BSA shall be assigned to Purchaser in its entirety, including all rights, obligations, and benefits arising thereunder.

**3.  Sherman Park Apartments (MDU)** — MDU Fiber Services Agreement dated February 10, 2024, by and between Seller and Sherman Park Apartments, LP.  BSA Units: 600. Units Passed: 276.  This BSA shall be assigned to Purchaser in its entirety, including all rights, obligations, and benefits arising thereunder.

**4.  Greenville Village (MDU)** — MDU Fiber Services Agreement dated August 8, 2024, by and between Seller and Kent and Meg Conine.  BSA Units: 323.  This BSA shall be assigned to Purchaser in its entirety, including all rights, obligations, and benefits arising thereunder.

**Total Phase I BSA Homes/Units: 4,419**

Seller represents and warrants that each of the above Fiber Services Agreements is in full force and effect as of the Effective Date, has not been amended, modified, or assigned except as described herein, and that Seller has full authority to assign such agreements to Purchaser.  In the event any Counterparty consent is required for assignment, Seller shall use commercially reasonable efforts to obtain such consent prior to or concurrent with execution of this Agreement. Notwithstanding the foregoing, the assignment of each Fiber Services Agreement shall be subject to the release of the UCC-1 financing statement held by Liberty Bankers Life Insurance Company, which Seller shall cause to be released prior to or concurrent with the satisfaction of the Lien Release Conditions as set forth in Section 6(i) of this Agreement.

SWDocID

Docusign Envelope ID: B8593398-E26B-85E3-835C-E01A4D8CA576

## EXHIBIT F
### Current Status of Installment under Fiber Services Agreements

| Community | BSA Homes | Contracted Remaining | Subscribers | Passed Only |
|---|---|---|---|---|
| Cresson Estates (161 passed / 1,496 BSA) | 1,496 | 1,200 | 135 | 161 |
| Kelly Ranch (245 passed / 2,000 BSA) | 2,000 | 1,755 | 50 | 195 |
| Sherman Park MDU (276 passed / 600 BSA) | 600 | 324 | 140 | 136 |
| Greenville Village MDU (323 BSA) | 323 | 0 | 19 | 304 |
| **SFU SUBTOTAL (Cresson + Kelly)** | **3,496** | **2,955** | **185** | **356** |
| **MDU SUBTOTAL (Sherman + Greenville)** | **923** | **324** | **159** | **440** |
| **PHASE I TOTAL PURCHASE PRICE** | **4,419** | **3,279** | **344** | **796** |

SWDocID

EXHIBIT G
Current Number of Subscribers by Project

| Community | Subscription |
|---|---|
| Cresson Estates | 135 |
| Kelly Ranch | 50 |
| Greenville MDU | 19 |
| Sherman MDU | 140 |
| **Phase I Subtotal** | **344** |

SWDocID

Docusign Envelope ID: B8593388-E26B-85E3-835C-E01A4D8CA576

EXHIBIT H
Form of Assignment and Assumption Agreement


ASSIGNMENT AND ASSUMPTION OF CONTRACTS

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS (this "Assignment"), dated as
_____, 2026 (the "Effective Date"), is by and between PRIVATE FIBER, INC., a
Texas corporation, ("Purchaser") and NORTH TEXAS FIBER, INC., a Texas corporation
("Seller"), regarding the contracts listed in Exhibit A attached hereto (collectively, the
"Contracts"). For good and valuable consideration, receipt of which is hereby acknowledged, the
parties hereby agree as follows:

1. Seller hereby assigns, conveys and transfers to Purchaser all of Seller's right, title and
interest in and to the Contracts. Seller agrees to cooperate with Purchaser in communicating
this assignment to any counterparties to any of the Contracts.

2. Purchaser hereby accepts the assignment of the Contracts, and Purchaser hereby assumes
and agrees to perform, fulfill and comply with all of the duties and obligations binding on
Seller under the Contracts (such covenants, agreements and obligations being herein
collectively referred to as the "Contractual Obligations"), as such Contractual Obligations shall
arise or accrue from and after the date of this Assignment. Seller hereby agrees to indemnify,
hold harmless and defend Purchaser from and against any and all third-party obligations,
liabilities, costs and claims (including reasonable attorney's fees) arising as a result of or with
respect to any of the Contractual Obligations that are attributable to the period of time prior to
the date of this Assignment.

3. This Assignment may be executed in counterparts, each of which shall be deemed an
original. The signature of a party to any counterpart may be attached to any other counterpart.
Any counterpart to which is attached the signatures of all parties shall constitute an original of
this assignment and any such document shall be considered to have the same binding legal
effect as an original document executed, delivered and exchanged between the parties

SWDocID

WITNESS THE SIGNATURES of the parties effective as of the date first set forth above.

**SELLER:**

NORTH TEXAS FIBER INC., a Texas corporation

By:_____

Name:____Nick Costas_____

Title:____CEO_____


**PURCHASER:**

PRIVATE FIBER, INC., a Texas corporation

By:_____

Name:____Nathan Chessher_____

Title:____CEO_____


SWDocID

Docusign Envelope ID: B8593389-E26B-85E3-835C-E01A4D8CA576

## Exhibit A
Contracts

(a) That certain Kelly Ranch Estates NTF Service and Entry Agreement dated November 18, 2022 by and between Seller and Kelly Ranch Estates LLC for the project commonly known as Kelly Ranch Estates.

(b) That certain North Texas Fiber Service and Entry Agreement 2023 dated February 3, 2023 by and between Seller and Cresson Estates HOA.

(c) That certain MDU Fiber Services Agreement (MDU Services Agreement) dated August 8, 2024 by and between Seller and Kent and Meg Conine;

(d) That certain MDU Fiber Services Agreement (MDU Services Agreement) dated February 10, 2024 by and between Seller and Sherman Park Apartments, LP.

SWDocID

EXHIBIT I
Form of Bill of Sale

# BILL OF SALE
AND GENERAL ASSIGNMENT
(*"Bill of Sale"*)

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

On _____ (4/15/2026), 2026, PRIVATE FIBER, INC., a Texas corporation ("Purchaser") and NORTH TEXAS FIBER, INC., a Texas corporation ("Seller"), entered into that Asset Purchase Agreement (the "*APA*") to which the Seller agreed to sell to Purchaser certain assets and Purchaser agreed to buy certain assets from Seller

It is the desire of Seller to assign, transfer and deliver to Purchaser the following (such properties being collectively called the "*Assigned Properties*"):

1.  Any and all rights of Seller in and to any network equipment, fiber infrastructure, materials, equipment and other similar items located anywhere at the Projects (as defined in the APA). Notwithstanding the foregoing, the Assets shall not include any data bank interconnections or interconnection equipment located at any data bank facility.

2.  All of Seller's interests in any customer agreements and intellectual property rights to extent existing related to the Projects;

3.  Any and all rights of Seller, if any, in and to, the all customer deposits with respect to any services that have not been performed by Seller as of the date hereof;

4.  Any and all rights of Seller, if any, in, to the extent permitted by law, all contract rights with respect to the customer subscription agreements and the Fiber Services Agreements pertaining to the Projects.

5.  Any and all rights of seller, if any, in, to the extent permitted by law, all contract rights with respect to the Service Level Agreements or backhaul agreements related to the Projects.

6.  All other tangible personal property of Seller's used in conjunction with the services provided to the Projects.

SWDocID

Docusign Envelope ID: B8593389-E26B-85E3-835C-E01A4D8CA576

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration in hand paid by Purchaser to Seller, the receipt and sufficiency of which are hereby acknowledged and confessed, Seller does hereby ASSIGN, TRANSFER and DELIVER to Purchaser and Purchaser's successors and assigns, all of the Assigned Properties without any warranty of any nature, either express or implied, except to the extent expressly provided for in the APA.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale to be effective as of the ___day of _____, 2026.

4/15/2026

**SELLER:**

NORTH TEXAS FIBER, INC., a Texas corporation

By: *Nick Costas*

Name: Nick Costas

Title: CEO

**PURCHASER:**

PRIVATE FIBER, INC., a Texas corporation

By: *[signature]*

Name: Nathan Chessher

Title: CEO

SWDocID

| | EXHIBIT<br>B |
|---|---|

# PRIVATE FIBER, INC.

4841 Williams Drive, Suite 107 • Georgetown, Texas 78633

June 3, 2026

**Inti Fiber**

*Re: Asset Purchase Agreement – Escrow Funding for UCC-1 and Lien Releases*

Dear Inti Fiber Team,

I hope this letter finds you well. I am writing on behalf of Private Fiber, Inc. ("Purchaser") in connection with the Asset Purchase Agreement dated February 15, 2026 (the "Agreement"), by and between Private Fiber, Inc. and North Texas Fiber, Inc. ("Seller") for the acquisition of certain fiber optic network assets and related Fiber Services Agreements in the Cresson Estates, Kelly Ranch Estates, Sherman Park Apartments, and Greenville Village projects (collectively, the "Assets").

Pursuant to Section 3 of the Agreement and the related Escrow Agreement, Purchaser is obligated to deposit funds into the interest-bearing escrow account maintained by Sneed & Vine LLP, Austin, Texas. These funds are designated to satisfy the Lien Release Conditions set forth in Section 6(i) of the Agreement, which include: (i) the release and termination of all UCC-1 financing statements filed by Liberty Bankers Life Insurance Company against the Assets; (ii) the resolution of all outstanding obligations owed by Seller to Texas State Utilities (approximately $46,000); and (iii) the resolution of all outstanding obligations owed by Seller to Momentum.

I am writing to formally confirm that Private Fiber, Inc. will fund the escrow account in the amount of **Six Hundred Fifty Thousand and 00/100 Dollars ($650,000.00)**, together with the remaining balance of the Short Term Note as scheduled in Exhibit B, on or before **July 1, 2026**. Upon satisfaction of the Lien Release Conditions and delivery of the required UCC-3 termination statements, paid-in-full letters, and other evidence reasonably satisfactory to Purchaser, the Escrow Agent will release the escrowed funds to Seller in accordance with the terms of the Agreement.

We remain fully committed to completing this transaction in an expeditious and professional manner and to achieving Closing no later than the Outside Date of September 30, 2026. We greatly appreciate your cooperation and assistance in coordinating with Liberty Bankers Life Insurance Company, Texas State Utilities, Momentum, and the various Counterparties (including the homeowners associations and backhaul providers) to satisfy all Closing Conditions in a timely fashion.

Should you or any of the lienholders require any additional documentation, written confirmation, or have questions regarding this funding commitment or the transaction generally, please do not

hesitate to contact me directly at your earliest convenience. We are prepared to move forward immediately upon receipt of the lien releases and other deliverables.

Thank you for your prompt attention to this important matter. We look forward to a successful Closing and to building a strong, long-term relationship.

Sincerely,

**Nathan Chessher**
Chief Executive Officer
Private Fiber, Inc.

*Enclosure: Relevant excerpts from Asset Purchase Agreement (Sections 3, 6, and Exhibit B) – available upon request*